# Charleston.

WILLIAM G. S. POWELL *vs.* AARON T. BATSON *et ux.*

January Term, 1871.

1. A chancellor has a discretionary authority to direct or to decline to direct an issue to try any material fact put in issue by the pleadings in the cause. Such discretion, however, is a sound or legal discretion, and its improper exercise either in directing or declining to direct an issue, may be reviewed and corrected by the appellate court.

2. The proper criterion by which to test the propriety or impropriety of such an issue, is that, where in a given case the decree rendered is sustained with reasonable certainty by the facts and circumstances disclosed by the record, there would be no error in omitting or refusing to direct an issue to try any material matters of fact put in issue by the pleadings. But if the correctness of the decree is made to depend on the existence or non-existence of such material facts, and the evidence and circumstances of the case are so equally balanced as to make their existence or non-existence doubtful, then it would be error to fail or refuse to direct an issue to be tried by a jury.

3. In the case at bar neither party demanded an issue, and as the decree was justified by the evidence, it was not error in omitting to direct an issue to try the validity of a paper-writing in question.

4. A case in which a motion for a re-hearing on the ground of after-discovered testimony, was properly refused, as the testimony was only cumulative.

Bill filed at April rules, 1866, in the clerk's office of the circuit court of Taylor county, by Aaron T. Batson and wife, against William G. S. Powell.

It alleged that on the 6th of June, 1844, one Davidson

and wife had conveyed to the complainants and defendant, a tract of land, lying in Taylor county, containing $67\frac{1}{4}$ acres, which was subject to a dower interest of the mother of the female complainant and the defendant. That in August, 1846, the complainants sold to the defendant $22\frac{1}{2}$ acres of the tract, being their interest therein, exclusive of the dower interest, and executed a title bond therefor, for the sum of 200 dollars. That afterwards, in 1852, the complainants purchased back the $22\frac{1}{2}$ acres from the defendant, and paid him in full for the same, as was evidenced by a receipt filed with the bill. This receipt was as follows:

"Receipt in full of all dealings of note or *account between* me and A. T. Batson, and said Batson is to have the land back that he sold me, which Batson has *satisfide* me for these $22\frac{1}{2}$ acres.

"June 9th, 1852.        W. G. S. POWELL."

The bill further alleged that, in this latter settlement and purchase the complainant Batson took up the title bonds he had executed in 1846, to the defendant, and that the complainants executed a deed to Powell for the said $22\frac{1}{2}$ acres, in pursuance of the title bond, but the defendant had never recorded it. That the defendant promised that he would destroy the deed so made by the complainants, which they supposed he had done. That all parties supposed this arrangement was sufficient at the time, but the complainants had been advised that the defendant should have reconveyed the land. That the defendant had been in possession and occupancy of the land ever since 1852, without rendering rents or profits. That the widow died in 1864.

The bill asked that the defendant be compelled to make a deed of general warranty for the $22\frac{1}{2}$ acres, and account for rents and profits; and also the land be so partitioned as to give complainants one moiety of the $67\frac{1}{4}$ acres, according to quantity and quality.

The defendant answered that he purchased the whole interest of the complainants in the $67\frac{1}{4}$ acres, in 1846, and

had paid for the same. That shortly after purchasing the same, he had begun to make, and had completed valuable improvements on the land; that he had erected a steam mill at a cost of 3,000 dollars thereon, with the full knowledge of the complainants, they residing only about seven or eight miles therefrom, and being aware that the defendant claimed the property; that the steam mill was erected after 1852, and that the complainants never set up any claim to the land until within a few years before the suit was brought. The answer admitted the execution of the title bond in 1846, and averred that the complainants tendered a deed for the 22½ acres, which he did not accept, because it did not convey all the land purchased, as he understood the contract. That the title bond remained in the possession of his stepfather, where defendant made his home, until complainants sent for it, alleging that they wanted to see it, so as to make a deed for the land; which occurred between 1848 and 1850, or thereabouts. That defendant had not seen the title bond since; that complainants sent out a deed which he objected to, and which had been left at his stepfather's; that he had frequently requested complainant Batson to produce the title bond and correct the deed, and he had promised to do so, but had failed so to do. That the deed had remained with the papers of his stepfather, and after the decease of the latter, the complainant Batson had called and examined them, and defendant had not seen the deed since. The defendant denied expressly that he ever resold the land to the complainants; that he executed the receipt of June 9th, 1852, and declared the same a forgery; that defendant never surrendered the title bond, directly or indirectly, or promised to destroy the deed tendered, or ever accepted the deed in a legal sense.

The answer claimed that the complainants should be compelled to execute a deed for the moiety of the 67¼ acres.

A cross-bill was filed, which set up more in detail the matters alleged in the answer, and interrogating the complainants specially.

The answer to the cross-bill also set out the details more fully alleged in the original bill, and denied all allegations of fraud, and brought out more fully the point at issue, concerning the validity and genuineness of the paper of June 9th, 1852.

The depositions taken in the cause were voluminous, and related principally to the genuineness of the signature of defendant to the receipt mentioned above, except the depositions of W. H. Shields and Isaac A. Morris, taken for the complainants. Several depositions proved the signature not to be the genuine signature, or not to look like defendant's signature. Two witnesses testified positively as to its not being the genuine signature of the defendant.

Shields, Morris, Maxwell, Davis, and J. C. Fleming, testified to its being his genuine signature. The three former were sought to be impeached, and much contradictory testimony was taken on this point, but as it is of the usual character in such cases, and the court here determines, upon consideration, that the effort to impeach was not successful, it is not thought necessary, or to be of interest, to set it forth.

Shields, for the complainants, proved that sometime after the sale of 1852, the defendant got him to go to the complainant Batson, to make some arrangements about cancelling the trade about the land. That he was to go to the latter and try to get back some paper-writing which the former had given to the latter, respecting the land. That witness did so, but Batson refused to do anything; but he refused to give up the contract, and said he intended to hold the land. That he returned the answer of Batson to Powell, who said something about a deed—that if he had not destroyed it he could have still held the land. That witness had been sheriff for over eight years from 1850, and generally Batson had paid the taxes on the land; sometimes, however, Powell paid them; sometimes each one paid half the taxes.

Morris, for the complainant, proved that he had been called upon by the parties to do some writing in relation to

land matters between them.  After some conversation they agreed to postpone the matter; and after further conversation Powell agreed to destroy, when he went home, an unrecorded deed from the complainants to the defendant for the land in controversy, and Batson agreed to take care of the receipt of June 9th, 1852, as a voucher, in case any difficulty should occur; that this was agreed upon to save the expense of recording two deeds.  That witness advised Powell to destroy the deed and Batson to retain the voucher.

Some depositions were taken by the defendant to prove that in 1860, complainant Batson had stated that he had sold his wife's interest in the land of her father, being the land in controversy, to the defendant; also, that in 1865, Batson stated that he had partially sold the land to Powell, but that the latter had acted the rascal with him, and " he intended to show him law before he got it." Also, that Batson had searched for papers among the papers of the stepfather of the defendant, where he was informed that defendant kept his papers.

The court below decreed that the complainants were entitled to a moiety of the 67¼ acres, and ordered a partition thereof, according to quantity and quality, excluding therefrom the improvements made by Powell, at the September term, 1867, and confirmed a report of partition at the February term, 1869.

After the first decree mentioned, Powell tendered an affidavit, stating that he had learned after the same had been rendered, that he could prove by one Harvey Mason, that he had heard writings read between Batson and Powell when they were both present, to the effect that Batson and wife had sold their entire interest in the land in controversy; also further testimony as to the credit to be given to witness Morris; and further testimony as to the searching of the papers of defendant's stepfather by Batson, thus raising a strong presumption as to his having obtained possession of the deed from himself and wife to defendant, and that such

testimony would materially change the result in the cause. A rehearing, however, was not allowed.

Powell appealed to this court.

Hon. John A. Dille, Judge of the III circuit, presided on the hearing of the cause.

*George H. Lee*, for the appellant.
*A. F. Haymond*, for the appellees.

BERKSHIRE, *President.*

The controversy in this case, I think, must turn mainly, on the validity of the paper-writing, filed with the appellees' bill as "exhibit No. 2." It purports to be a receipt from the defendant Powell, to the complainant Aaron T. Batson, for all demands, and acknowledgment that he was to have back the 22½ acres of land, which he had previously sold to Powell. It is clear, therefore, that if this paper is to be regarded as genuine, the appellee's right to a partition of the whole tract of 67½ acres, conveyed to the defendant and the female appellee by John Davidson, is made out, and consequently there would be no error in the decree complained of. If, however, the validity of the paper is not satisfactorily established, then the controversy would be narrowed to the difference between the 22½ acres and a moiety of the entire tract of 67½ acres. As the genuineness of the paper is denied by Powell, on oath, in his answer to the original bill, and affirmed by Batson, under oath, in his answer to the cross-bills, *their* testimony is thus neutralized, and the question of its validity must depend on the other testimony in the cause. How then does it stand on the independent testimony ?

The signature of Powell to the paper is proven distinctly by four witnesses, viz.: William H. Shields, Isaac A. Morris, Maxwell Davis and John C. Fleming. On the other hand it is disproved by two witnesses, Josephus Bailey and James B. Sinsell, while a number of other witnesses express

some doubts, but decline to speak positively, or with anything like certainty, as to the genuineness of Powell's signature.

Three of the witnesses, viz: Shields, Morris and Davis, were attempted to be discredited and impeached, and unless the effort was successful, I think the validity of the paper ought to be regarded as established. For if the testimony, especially of Shields and Morris, or either of them, is to be taken as true, it must, in my judgment, be conclusive of the question. Shields testifies that some time after the date of this paper he went, at the instance of Powell, to see Batson, to make some arrangement to cancel a land trade about the land in controversy, and to prevail on him to give up to Powell some paper which he, Batson, held for the lands. That Batson declined to do anything, and stated that "he intended to hold the land;" and that upon communicating to Powell what Batson said, the former said something about a deed, and stated that "if he had not destroyed it, he could still have held the land." He further proves that he was sheriff of Taylor county for upwards of eight years from 1850, and that during that time, Batson generally paid the taxes on the land in controversy, and paid the larger part of such taxes, but that he would sometimes pay the one-half and leave Powell to pay the other half of said taxes. Morris proves that he was present when the paper was signed by Powell, at the time the settlement and arrangement was made between him and Batson, and that Powell at the same time agreed to destroy the deed that Batson and wife had previously made to him for the 22½ acres, and that this arrangement as to the destruction of the deed, was adopted at the suggestion of the witness, as it would save the cost of a conveyance, &c.

The question now is: Were these witnesses, or either of them, successfully impeached?

Without adverting to the testimony in detail, I am compelled, after a careful examination and analysis of it, to

conclude that the effort to do so was clearly unsuccessful. Their testimony, therefore, not being essentially impaired, as before seen, the validity of the paper in question is to be regarded as established. And so regarding it, renders it unnecessary to consider what the position of the parties would have been if it had been overthrown, and the controversy thereby reduced to the question of the extent of the original purchase by Powell.

It is insisted by the appellant that, the court erred in affirming by its decree the genuineness of the paper in question, without first directing an issue as to its validity, to be tried at the bar by a jury.

That the chancellor has a discretionary authority to direct, or to decline to direct, an issue to try any material fact put in issue by the pleadings in the cause, is not doubted, and the doctrine is well settled by the authorities. Such discretion, however, it is equally well established, is a sound or legal discretion, and its improper exercise, either in directing or declining to direct an issue, may be reviewed and corrected by the appellate court.    *Wise* v. *Lamb*, 9 Grattan, 294; *Mitterly, administrator*, v. *Hagan*, 18 Grattan, 231.

Whether the discretion exercised in any case falls within the definition of a sound discretion may be, and often is, a very difficult question to determine, and depends alone on the facts and circumstances of each case. In *Wise* v. *Lamb*, the case was reversed, because an issue had been improperly directed, while in the case of *Mitterly, administrator*, v. *Hagan*, there was a reversal of the decree for the failure to direct one.

In the former case the defence of usury was set up against the collection of certain bonds, and an issue to try that question was directed by the chancellor, upon which a verdict was rendered, affirming the usury and sustaining the defence.    It was held, however, that the proofs in the cause furnished no sufficient grounds for directing such issue, and the case was accordingly reversed, the issue and the verdict thereon were set aside, the injunction dissolved and the bill

dismissed. Lee, J., in delivering the opinion of the court, after adverting to the testimony in detail, says : " Now giving to this testimony its fullest weight and widest latitude for inference, it is impossible to say that it makes out the charge of usury contained in the bill, or overthrows, or even shakes the positive, direct and express denial of that charge, and of the facts and elements in which the supposed usury was alleged to consist." And again, "but it is well settled that a mistake in the exercise of the discretion of the court upon this subject, is just ground for appeal." And after adverting to certain cases that would make it proper for an issue, he further observes : " So where the evidence is conflicting, or there is contradictory evidence between persons of equal credit and equal means of information, and the evidence is so equally balanced that it becomes doubtful which scale preponderates, an issue will be proper."

The proper criterion, therefore, (if any could be suggested,) by which to test the propriety or impropriety of such issues, I take to be this : that where in a given case the decree rendered is sustained with reasonable certainty by the facts and circumstances disclosed by the record, there would be no error, in omitting or refusing to direct an issue to try any material matters of fact put in issue by the pleadings. But if the correctness of the decree is made to depend on the existence or non-existence of such material facts, and the evidence and circumstances of the case are so equally balanced, as to make their existence or non-existence doubtful, then it would be error to fail or refuse to direct an issue to be tried by a jury.

It does not appear in the case under review, that either party demanded an issue, and, as in my judgment, the decree complained of was well justified by the evidence in the cause, it follows that there could be no error in omitting to direct an issue to try the validity of the paper-writing in question.

The remaining error relied on is, the refusal to continue and rehear the cause upon the affidavits filed in support of

the motion for such continuance and rehearing, upon the ground of after discovered testimony.

It appears that the additional testimony discovered, consisted of one witness, whose evidence, it appears, would be cumulative only and in support of other witnesses, as to facts already testified to in the cause. I am of opinion, therefore, that no proper ground was shown for the continuance, and that the court did not err in overruling the motion. Upon the whole, I cannot see any error in the decree complained of, and think it ought to be affirmed, with costs and damages.

The other judges concurred.

DECREE AFFIRMED.